# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| JULIO DEL RIO, JACK MURPHY, and STEVEN BIXBY, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br> v.<br><br>CROWDSTRIKE, INC.,<br><br>   Defendant. | Case No. 1:24-cv-00881<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Julio del Rio, Jack Murphy, and Steven Bixby (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, bring this Class Action Complaint against Defendant CrowdStrike, Inc. ("Defendant" or "CrowdStrike"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters as follows.

## INTRODUCTION

1. CrowdStrike is a cybersecurity firm that offers commercial data protection and cybersecurity services and products intended to keep computers safe from cyberattacks and malware, including its Falcon platform ("Falcon").

2. On July 19, 2024, CrowdStrike released a security software update for its Falcon platform. Rolling out this update should have been a routine process without any noticeable impact on CrowdStrike's customers' information technology ("IT") systems. Instead, shortly after the release of the update "a global tech disaster was underway."[1]

---

[1] Tom Warren, *Inside the 78 minutes that took down millions of Windows machines*, THE VERGE (July 23, 2024 10:40 AM), https://www.theverge.com/2024/7/23/24204196/crowdstrike-windows-bsod-faulty-update-microsoft-responses.

3.     Due to CrowdStrike's negligent conduct, the software update contained one or more serious bugs[2] or errors that caused millions of computers around the world to repeatedly crash and become inoperable (the "CrowdStrike Outage").

4.     The consequences of CrowdStrike's flawed update were catastrophic. In total, over 8,500,000 devices went offline due to the CrowdStrike update.[3] CrowdStrike's carelessness caused one of the largest global IT system outages in history.[4]

5.     CrowdStrike's Falcon platform is used by many of the world's largest companies across a range of industries, including the aviation industry. The CrowdStrike Outage disrupted airline and airport IT systems, causing a cascade of flight delays and cancellations as airlines struggled to operate with their computer systems offline.[5]

6.     CrowdStrike's flawed update not only interfered with airlines—it also severely interrupted the lives of the millions of people traveling in the days immediately following the CrowdStrike Outage. The CrowdStrike Outage grounded thousands of flights and delayed

---

[2] "A software bug is a problem causing a program to crash or produce invalid output. The problem is caused by insufficient or erroneous logic. A bug can be an error, mistake, defect or fault, which may cause failure or deviation from expected results." Margaret Rouse, *Software Bug*, TECHOPEDIA (June 20, 2024), https://www.techopedia.com/definition/24864/software-bug.

[3] *E.g.*, CIO Staff & Francisca Dominguez Zubicoa, *Delta Airlines to 'rethink Microsoft' in wake of CrowdStrike outage*, CIO (Aug. 1, 2024), https://www.cio.com/article/3480378/delta-airlines-to-rethink-microsoft-in-wake-of-crowdstrike-outage.html.

[4] *See The Consequences Of The CrowdStrike Update*, NPR (July 31, 2024 6:18 PM), https://www.npr.org/2024/07/31/1198912548/1a-07-31-2024#:~:text=The%20Consequences%20Of%20The%20CrowdStrike%20Update%20%20%3A%201A%20It's%20been%20called,to%20broadcast%20news%20to%20hospitals.

[5] *See* Aarian Marshall, *Why the Global CrowdStrike Outage Hit Airports So Hard*, WIRED (July 19, 2024 5:00 PM), https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/.

thousands more, often stranding travelers in airports thousands of miles away from their intended destination for hours—and even days. [6]

7.      But lengthy delays were not the only consequence of the outage for travelers. Faced with increasingly long delays and mounting flight cancellations, many travelers had no option but to spend hundreds of dollars or more on additional meals, lodging, or other travel arrangements as they desperately sought a way to their destination.

8.      CrowdStrike's failure to properly develop, test, and deploy the Falcon update caused the CrowdStrike Outage and delayed or cancelled Plaintiffs' and Class members' flights. These delays and cancellations in turn forced Plaintiffs and Class members to incur additional expenses and damages. This action seeks to remedy these consequences of CrowdStrike's negligence. Plaintiffs bring this action on behalf of themselves and all persons who had a flight delayed or cancelled as a result of the CrowdStrike Outage.

9.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, violation of the California Unfair Competition Law, and public nuisance, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

**Plaintiff Julio del Rio**

10.     Plaintiff Julio del Rio is a citizen of California.

---

[6] *E.g.*, Shayla Reaves & Athony Bettin, *Days after CrowdStrike outage, North Carolina woman still stuck at MSP Airport*, CBS NEWS (July 22, 2024 7:55 AM), https://www.cbsnews.com/minnesota/news/north-carolina-woman-stuck-at-msp-airport-after-crowdstrike-outage/.

11.     Plaintiff del Rio and his spouse had purchased tickets for a July 19, 2024 direct flight from Hawaii's Kona International Airport ("KOA") to Los Angeles International Airport for approximately $800.

12.     The CrowdStrike Outage affected the IT system of the airline Plaintiff del Rio planned to travel on, which caused Plaintiff del Rio's flight to be delayed multiple times, before ultimately being canceled. Plaintiff del Rio was forced to spend time and effort attempting to arrange an alternative later flight to Los Angeles.

13.     The chaos caused by the CrowdStrike Outage meant Plaintiff del Rio was not able to book another direct flight from KOA to Los Angeles International Airport on the same airline. Instead, Plaintiff del Rio was forced to purchase tickets for a different airline's flight to San Francisco, California. Plaintiff del Rio paid approximately $1,200 out-of-pocket for these tickets. He has not received a reimbursement or refund of the cost of his tickets on the original, canceled flight.

14.     Plaintiff del Rio's flight to San Francisco was scheduled to leave on July 20, 2024, the day after his original flight would have left but for the CrowdStrike Outage. As a result, Plaintiff del Rio was stranded at KOA for an additional 11 hours overnight.

15.     Stranded overnight at the airport due to the CrowdStrike Outage, Plaintiff del Rio had no other options but to sleep on benches or the floor during the 11-hour delay. As a result, Plaintiff del Rio developed pain in his neck and back which lasted for several days.

16.     The CrowdStrike Outage was still causing massive flight delays and cancellations when Plaintiff del Rio arrived in San Francisco. As a result, Plaintiff del Rio could not get a flight from San Francisco to Los Angeles. Instead, he had to purchase tickets on yet another flight, this time from San Jose, California, to Burbank, California.

17. Plaintiff del Rio had no way to reach the San Jose airport for his next flight other than to pay for an Uber, which cost him approximately $80. Once Plaintiff del Rio arrived at the Burbank airport, he again had to pay for an Uber to take him home, which cost approximately $80.

18. Because the CrowdStrike Outage caused such extensive flight delays and cancellations, Plaintiff del Rio did not arrive home until approximately 11:00 PM PST on July 20, 2024, approximately 17 hours after he was originally scheduled to return. As a result of the nearly 17 extra hours of travel, Plaintiff del Rio was forced to use his accrued paid time off to miss an additional day of work

**Plaintiff Jack Murphy**

19. Plaintiff Jack Murphy is a citizen of Ohio.

20. On July 19, 2024, Plaintiff Murphy planned to fly from Columbia, South Carolina to Atlanta, Georgia, and from Atlanta to Cleveland, Ohio.

21. The CrowdStrike Outage affected the IT system of the airline Plaintiff Murphy planned to travel on. As a result, Plaintiff Murphy's flight from Columbia to Atlanta was delayed for several hours, before ultimately being canceled. Plaintiff Murphy was forced to spend time and effort arranging an alternative later flight from Columbia to Atlanta.

22. Due to the CrowdStrike Outage, Plaintiff Murphy's flight from Atlanta to Cleveland was also significantly delayed, stranding Plaintiff Murphy in the Atlanta airport for approximately nine hours. During the delay, he spent additional time and effort attempting to arrange an alternate flight to Cleveland, including waiting in a line to speak with airline personnel for nearly three and a half hours before Plaintiff Murphy was able to book a different flight to Cleveland.

23.     Due to the CrowdStrike Outage, Plaintiff Murphy did not arrive in Cleveland until approximately 2:30 AM CDT on July 20, 2024. Due to the late hour, Plaintiff Murphy could not hire an Uber to drive him from the Cleveland airport to his home. As a result, Plaintiff Murphy's wife was forced to drive to the airport to pick up Plaintiff Murphy, a trip of approximately 45 minutes each way. This drive to and from the airport, which would not have been necessary had the CrowdStrike Outage not grounded flights, used gas that Plaintiff Murphy would not have otherwise used and added additional wear to Plaintiff Murphy's vehicle.

24.     Plaintiff Murphy did not arrive home until approximately 3:30 AM, which severely interrupted Plaintiff Murphy's normal sleep schedule. The disruption to Plaintiff Murphy's sleep schedule caused him to suffer a migraine during the day of July 20, 2024. Plaintiff Murphy experienced dizziness, pains in his head, sensitivity to light, and nausea due to the migraine.

**Plaintiff Steven Bixby**

25.     Plaintiff Steven Bixby is a citizen of Pennsylvania.

26.     On July 19, 2024, Plaintiff Bixby planned to fly from Harrisburg, Pennsylvania to O'Hare International Airport in Chicago, Illinois ("O'Hare"), and from O'Hare to Fort Worth, Texas.

27.     The CrowdStrike Outage affected the IT system of the airline Plaintiff Bixby planned to travel on. As a result, Plaintiff Bixby's flight from Harrisburg to O'Hare was delayed approximately three hours. Plaintiff Bixby's flight from O'Hare to Fort Worth was similarly delayed for approximately four hours as a result of the CrowdStrike Outage.

28.     Plaintiff Bixby's trip from Harrisburg to Fort Worth was scheduled to take approximately eight hours. But because the CrowdStrike Outage delayed his flights, his trip instead took approximately 17.5 hours—over nine hours longer than it otherwise would have.

29.     Because the CrowdStrike Outage affected the IT system of the airline Plaintiff Bixby travelled on, Plaintiff Bixby's luggage was delayed and did not arrive in Fort Worth until several hours after Plaintiff Bixby. Plaintiff Bixby had to return to the airport to retrieve his luggage when it finally arrived at approximately 2:00 AM CDT on July 20, 2024.

**Defendant CrowdStrike, Inc.**

30.     Defendant CrowdStrike, Inc., is a Delaware corporation with its principal place of business located at 206 E. 9th Street, Suite 1400, Austin, TX 78701. It may be served through its registered agent: Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

32.     This Court has general personal jurisdiction over Defendant CrowdStrike, Inc., because it maintains its principal place of business in this State, regularly conducts business in this State, and has sufficient minimum contacts in this State.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal places of business are in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of CrowdStrike*

34.     Founded in 2011, CrowdStrike's products are "tailored for large [organizations] in which CrowdStrike's tools help them monitor their networks for signs of attack, and provide them with the information they need to respond to intrusions in a timely way."[7]

35.     CrowdStrike "is among the most popular cybersecurity providers in the world, with close to 30,000 subscribers globally."[8] Among CrowdStrike's customers are 298 Fortune 500 companies, including financial service firms, healthcare providers, technology firms, and food and beverage companies, among others.[9] Also amongst its customers are major airlines, including American Airlines, Delta, and United.[10] These "are huge companies that collectively have *hundreds of millions* of Windows PCs and systems."[11]

36.     CrowdStrike's "primary technology is the Falcon platform, which helps protect systems against potential threats in a bid to minimize cybersecurity risks."[12] Falcon is a security

---

[7] Toby Murray, *What is CrowdStrike Falcon and what does it do? Is my computer safe?*, THE CONVERSATION (July 19, 2024 6:20 AM), https://theconversation.com/what-is-crowdstrike-falcon-and-what-does-it-do-is-my-computer-safe-235123#:~:text=CrowdStrike%20is%20a%20US%20cyber,response%E2%80%9D%20(EDR)%20software.

[8] Martin Coulter, *CrowdStrike chaos could prompt rethink among investors, customers*, REUTERS (July 19, 2024 5:52 PM), https://www.reuters.com/technology/cybersecurity/crowdstrike-chaos-could-prompt-rethink-among-investors-customers-2024-07-19/#:~:text=CrowdStrike%20%2D%20which%20previously%20reached%20a,its%20growth%20and%20high%20margin.

[9] *We stop breaches*, CROWDSTRIKE, https://www.crowdstrike.com/platform/ (last accessed Aug. 5, 2024).

[10] Kim Komando, *The real reason CrowdStrike brought companies to their knees*, KOMANDO (July 20, 2024), https://www.komando.com/news/the-real-reason-crowdstrike-brought-companies-to-their-knees/.

[11] *Id.* (emphasis in original).

[12] Sean Michael Kerner, *CrowdStrike outage explained: What caused it and what's next*, TECHTARGET (July 25, 2024), https://www.techtarget.com/whatis/feature/Explaining-the-largest-IT-outage-in-history-and-whats-next.

software product that, once installed on a computer, helps prevent cyberattacks and malware.[13] Falcon is "purpose-built to stop breaches via a unified set of cloud-delivered technologies that prevent all types of attacks — including malware and much more."[14]

37.    CrowdStrike offers its software products, including those responsible for or involved in the CrowdStrike Outage, on a subscription basis to its customer. CrowdStrike licenses the use of the software, but at all times retains ownership of the software.[15]

### *The CrowdStrike Outage*

38.    On or about Friday, July 19, 2024, "as part of regular operations, CrowdStrike released a [Falcon] content configuration update for the Windows sensor to gather telemetry on possible novel threat techniques."[16] Updates of this type "are a normal part of the [Falcon] sensor's operation and occur several times a day in response to novel tactics, techniques, and procedures discovered by CrowdStrike."[17] CrowdStrike claims "[t]his is not a new process; the architecture has been in place since Falcon's inception."[18]

39.    With that update, CrowdStrike "introduced a logic error" which caused the Falcon sensor to crash and, as a result, crashed the Windows systems itself.[19] The crashes were caused by

---

[13] Murray, *supra* note 7.

[14] *What is CrowdStrike? Falcon platform FAQ*, CROWDSTRIKE, https://www.crowdstrike.com/products/faq/ (last accessed Aug. 5, 2024).

[15] *E.g.*, *CrowdStrike Terms and Conditions*, CROWDSTRIKE, https://www.crowdstrike.com/terms-conditions/ (last accessed Aug. 5, 2024); *CrowdStrike Software Terms of Use*, CROWDSTRIKE, https://www.crowdstrike.com/software-terms-of-use/ (last accessed Aug. 5, 2024).

[16] *Preliminary Post Incident Review (PIR): Content Configuration Update Impacting the Falcon Sensor and the Windows Operating System (BSOD)*, CrowdStrike (July 24, 2024), https://www.crowdstrike.com/blog/falcon-content-update-preliminary-post-incident-report/.

[17] *Technical Details: Falcon Content Update for Windows Hosts*, CROWDSTRIKE (July 20, 2024), https://www.crowdstrike.com/blog/falcon-update-for-windows-hosts-technical-details/.

[18] *Id.*

[19] Kerner, *supra* note 12.

"a defect in the Rapid Response Content, which went undetected during validation checks."[20] The July 19 update supposedly "passed validation despite containing problematic content data."[21] CrowdStrike did not subject the update to additional testing or verifications before publishing it.[22]

40.     Once a Windows computer received the update, "problematic content in [the update] resulted in an out-of-bounds memory read triggering an exception. This unexpected exception could not be gracefully handled, resulting in a Windows operating system crash."[23]

41.     Windows computers that received the Falcon update were forced into a "recovery boot loop," meaning the computers could not start and operate properly.[24] The computers displayed a "blue screen of death," which indicates a "stop error . . . a critical error that has caused the Windows operating system to crash."[25]

42.     CrowdStrike's channel file updates, such as the update that caused the CrowdStrike Outage, "were pushed to computers regardless of any settings meant to prevent such automatic updates."[26]

---

[20] *Preliminary Post Incident Review Executive Summary*, CROWDSTRIKE, https://www.crowdstrike.com/wp-content/uploads/2024/07/CrowdStrike-PIR-Executive-Summary.pdf (last accessed Aug. 5, 2024).

[21] *Id.*

[22] Bill Toulas, *CrowdStrike: 'Content Validator' bug let faulty update pass checks*, BLEEPING COMPUTER (July 24, 2024 10:16 AM), https://www.bleepingcomputer.com/news/security/crowdstrike-content-validator-bug-let-faulty-update-pass-checks/.

[23] *Preliminary Post Incident Review (PIR)*, *supra* note 16.

[24] Tom Warren, *Major Windows BSOD issue hits banks, airlines, and TV broadcasters*, THE VERGE (July 19, 2024 2:17 AM), https://www.theverge.com/2024/7/19/24201717/windows-bsod-crowdstrike-outage-issue.

[25] Davey Winder, *Blue Screen of Death—Microsoft Says Turn It Off And On Again And Again And Again*, Forbes (July 20, 2024 7:03 AM), https://www.forbes.com/sites/daveywinder/2024/07/20/blue-screen-of-death-microsoft-says-turn-it-off-and-on-again-and-again-and-again/.

[26] Wes Davis, *CrowdStrike's faulty update crashed 8.5 million Windows devices, says Microsoft*, THE VERGE (July 20, 2024 12:20 PM), https://www.theverge.com/2024/7/20/24202527/crowdstrike-microsoft-windows-bsod-outage.

43.     Falcon "follows a common practice of continuous integration and continuous delivery . . . such that software updates are deployed at once for many customers at scale."[27] In total, the "faulty update" caused a global technology disaster that affected 8.5 million Windows devices.[28]

### CrowdStrike Knew of the Risks of a Software Error

44.     At all relevant times, CrowdStrike knew, or should have known, that failing to develop, implement, and maintain reasonable software development, testing, and validation processes, procedures, or controls would inevitably result in it publishing and disseminating a software update containing serious flaws, errors, invalid data, or bugs.

45.     At all relevant times, CrowdStrike also knew, or should have known, that publishing and disseminating an update containing serious flaws, errors, invalid date, or bugs, would cause a massive and widespread outage of its customers' computer systems.

46.     Software containing a flaw or bug can "degrade interconnected systems or cause serious malfunctions."[29] To prevent these issues, software testing is an essential practice to ensure software functions as expected and to detect serious flaws, errors, invalid data, or bugs in the software.[30]

---

[27] *See* Matt Kapko, *CrowdStrike says flawed update was live for 78 minutes*, CYBERSECURITY DIVE (July 23, 2024), https://www.cybersecuritydive.com/news/crowdstrike-flawed-update-78-minutes/722070/.
[28] Davis, *supra* note 26.
[29] *What is software testing?*, IBM, https://www.ibm.com/topics/software-testing (last accessed Aug. 5, 2024).
[30] *The Importance of Software Testing*, IEEE COMPUT. SOC., https://www.computer.org/resources/importance-of-software-testing (last accessed Aug. 5, 2024).

47.     "The importance of effective testing cannot be overstated when developing and maintaining complex, reliable software systems in today's world."[31] Indeed, CrowdStrike itself recommends that organizations search for and detect software bugs.[32]

48.     While companies such as CrowdStrike deploy security updates often, "it is important that they aren't rushed and go through the basic due diligence to ensure something like CrowdStrike [O]utage doesn't happen."[33] If a software update has the potential to affect "not just your users but your users' users, you must slow-roll the release over a period of hours or days, rather than risk crippling the entire planet with one large update."[34]

49.     In filings with the Security and Exchange Commission, CrowdStrike has acknowledged the risk that product enhancements "may have quality or other defects or deficiencies."[35] CrowdStrike also knew that, "[b]ecause our cloud native security platform is complex, it may contain defects or errors that are not detected until after deployment."[36] It further knew that "errors, defects or performance problems in our software" and "improper deployment or configuration of our solutions" could affect the delivery, availability, and performance of its Falcon platform.[37]

---

[31] *Id.*

[32] *See* Jacob Garrison, *How to Secure Business-Critical Applications*, CROWDSTRIKE (Feb. 9, 2024), https://www.crowdstrike.com/blog/how-to-secure-business-critical-applications/.

[33] Shweta Sharma, *CrowdStrike was not the only security vendor vulnerable to hasty testing*, CSO ONLINE (July 29, 2024), https://www.csoonline.com/article/3478372/crowdstrike-was-not-the-only-security-vendor-vulnerable-to-hasty-testing.html.

[34] *Id.*

[35] *Form 10-K*, CROWDSTRIKE (Mar. 6, 2024), https://ir.crowdstrike.com/static-files/29e71f45-3c39-4c2c-9159-5e7bb9f3315b.

[36] *Id.*

[37] *See id.*

50.     The aviation sector is considered part of America's critical infrastructure according to the Cybersecurity and Infrastructure Security Agency.[38] CrowdStrike knows its Falcon platform is used by airlines and airports.[39]

51.     CrowdStrike knew that the incapacitation of critical infrastructure systems, such as the aviation sector, "would have a debilitating effect on the security and safety of [American] citizens."[40] CrowdStrike also knew that "nearly all critical infrastructures rely heavily on cyber and network support to operate these essential systems."[41]

52.     CrowdStrike knew that "[a]irport and aircraft operators run complex networks of IT and OT systems to move passengers and freight safely and efficiently across the United States."[42] It also knew that disruption of airline information technology and operational technology systems could cause "business degradation and disruption of airline operations."[43]

53.     It is clear that the "tech providers that support infrastructure relied upon by the public and private sectors bear a responsibility to protect our safety and security."[44] Therefore,

---

[38] *Transportation Systems Sector*, CYBERSEC. & INFRASTRUCTURE SEC. AGENCY, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/transportation-systems-sector (last accessed Aug. 5, 2024).

[39] *E.g.*, Jamie Gale, *Porter Airlines Consolidates Its Cloud, Identity and Endpoint Security with CrowdStrike*, CROWDSTRIKE (Apr. 18, 2024), https://www.crowdstrike.com/blog/porter-airlines-consolidates-cybersecurity-with-crowdstrike/.

[40] Shawn Henry, *Critical Infrastructure: One More Thing to Give Thanks For — and Protect*, CROWDSTRIKE (Nov. 22, 2016), https://www.crowdstrike.com/blog/critical-infrastructure-one-thing-give-thanks-protect/.

[41] *Id.*

[42] *Cyber Resilience for the Airline Industry*, CROWDSTRIKE, https://www.crowdstrike.com/wp-content/uploads/2023/04/crowdstrike-cyber-resilience-for-airline-industry.pdf (last accessed Aug. 5, 2024).

[43] *See id.*

[44] Heidi Boghosian, Opinion: *The CrowdStrike outage shows the danger of depending on Big Tech overlords*, LA TIMES (July 23, 2024 12:07 PM), https://www.latimes.com/opinion/story/2024-07-23/crowdstrike-outage-microsoft-tech-security.

technology providers must prioritize security and reliability in their products "over other incentives such as cost, features, and speed to market."[45]

54.     CrowdStrike, as a cybersecurity company, was and is well aware of the damage a large-scale IT system outage would cause. CrowdStrike also knew of the risks of system failures posed by software and software updates containing serious flaws, errors, invalid data, or bugs. It knows that the "adverse effects of any service interruptions . . . may be disproportionately heightened due to the nature of [its] business and the fact that [its] customers have a low tolerance for interruptions of any duration."[46]

55.     CrowdStrike failed to adequately and reasonably test or validate the July 19, 2024 update to ensure it did not contain any serious flaws, errors, invalid data, or bugs. Had CrowdStrike developed, implemented, and maintained reasonable software development, testing, and validation processes, procedures, or controls, it would have discovered the serious flaws, errors, invalid data, or bugs in the July 19, 2024 update and prevented the CrowdStrike Outage from occurring.

56.     For example, it is "a fairly standard practice to roll out updates gradually, letting developers test for any major problems before an update hits their entire user base."[47] If CrowdStrike had followed this industry-standard process, it would have discovered the flaws, errors, invalid data, or bugs in the update, and would not have published and disseminated the flawed update to all of its customers, including airlines[48]. This process would have prevented the global effects of the CrowdStrike Outage.

---

[45] Jessica Lyons, *US cybersecurity chief: Software makers shouldn't lawyer their way out of security responsibilities*, THE REGISTER (Feb. 28, 2023 10:23 PM), https://www.theregister.com/2023/02/28/cisa_easterly_secure_software/.
[46] *Form 10-K*, *supra* note 35.
[47] Warren, *supra* note 1.
[48] *See id.*

57.     The CrowdStrike Outage was entirely foreseeable, especially in light of other recent software problems that have similarly affected consumers. For example, in January, 2023, a damaged database file forced the FAA to impose a nationwide ground stop, which delayed more than 10,000 flights and resulted in over 1,300 flights being cancelled.[49] In April, 2023, Southwest Airlines experienced a technology failure caused by a failure in vendor-supplied software.[50] The technical issue forced Southwest Airlines to ground 1,820 flights nationwide.[51] In 2010, an error in a security update for McAfee's corporate antivirus software caused Windows computers around the globe to crash.[52]

58.     These and other similar events illustrate why it is "absolutely critical" that vendors supplying software updates or patches "thoroughly test [them] to ensure that those updates are not causing harm or outages."[53]

59.     CrowdStrike knew or should have known of these and other similar instances of software and IT system failures, and CrowdStrike knew or should have known that publishing and

---

[49] David Shepardson et al., *Airlines hope for return to normal Thursday after FAA outage snarls U.S. travel*, REUTERS (Jan. 11, 2023 8:28 PM), https://www.reuters.com/business/aerospace-defense/us-faa-says-flight-personnel-alert-system-not-processing-updates-after-outage-2023-01-11/.

[50] *See* Allison Lampert & Rajesh Kumar Singh, *Southwest network failure raises concerns over system's strength*, REUTERS (Apr. 20, 2023 5:00 AM), https://www.reuters.com/business/aerospace-defense/southwest-network-failure-raises-concerns-over-systems-strength-2023-04-19/.

[51] Stefanie Schappert, *Southwest Airlines forced to ground all US flights – again*, CYBERNEWS (Apr. 19, 2023 6:52 AM), https://cybernews.com/news/southwest-airlines-technical-issues-flights-grounded-again/.

[52] David Kravets, *McAfee Probing Bungle That Sparked Global PC Crash*, WIRED (Apr. 22, 2010 1:24 PM), https://www.wired.com/2010/04/mcafeebungle/; Declan McCullagh, *Buggy McAfee update whacks Windows XP PCs*, CNN (Apr. 22, 2010 11:24 AM), https://www.cnn.com/2010/TECH/04/22/cnet.mcafee.antivirus.bug/index.html.

[53] Sharma, *supra* note 33.

dissemination a software update for its Falcon platform containing serious flaws, errors, invalid data, or bugs would cause similar flight delays and cancellations.

### *The CrowdStrike Outage Caused Widespread Flight Delays and Cancellations*

60. The CrowdStrike Outage had major impacts on air travel within the United States and internationally. Airlines were hit "particularly hard" by the CrowdStrike Outage due to the aviation sector's "sensitivity to timings."[54]

61. A statement by United Airlines indicated the CrowdStrike outage "affected many separate systems, such as those used for calculating aircraft weight, checking in customers, and phone systems in our call centers."[55] Plaintiffs and Class members "faced delays, cancellations and problems checking in as airports and airlines" were ground to a halt by the CrowdStrike Outage.[56]

62. According to the Federal Aviation Administration, "several U.S. carriers, including American Airlines, United Airlines, and Delta Air Lines, issued ground stops for all their flights early on" Friday, July 19, 2024, due to the CrowdStrike Outage.[57] By approximately 8:40 PM ET on Friday, July 19, 2024, over 3,000 flights had been canceled and over 11,000 flights had been

---

[54] Zach Wichter et al., *2,600+ US flights canceled: United, American Airlines resume service after global outage*, USA Today (July 19, 2024 5:18 PM), https://www.usatoday.com/story/travel/news/2024/07/19/global-it-outage-flights-canceled-delayed/74466125007/.

[55] Zach Wichter et al., *1,600+ US flights canceled Saturday: United, Delta still working to recover from outage*, USA TODAY (July 20, 2024 9:02 AM), https://www.usatoday.com/story/travel/airline-news/2024/07/20/flight-canceled-delta-united/74481266007/.

[56] Wichter et al., *supra* note 54.

[57] *See id.*

delayed.[58] Reports indicate that in total over 46,000 flights were delayed and 5,171 flights were cancelled as a result of the CrowdStrike Outage on July 19, 2024 alone.[59]

63.     The CrowdStrike Outage was not quickly resolved. Over 1,600 flights were canceled, and more than 4,900 flights were delayed by 3:00 PM ET on the following Saturday, July 20, 2024.[60] By Monday, July 22, 2024, Delta alone had canceled over 4,400 flights due to problems caused by the faulty update.[61]

64.     Plaintiffs and Class members are individuals whose flights were canceled or delayed as a result of the CrowdStrike Outage.

### *Damages Sustained by Plaintiffs and the Other Class Members*

65.     Plaintiffs and all other Class members have suffered injury and damages including, but not limited to: (i) lost time incurred by delayed and canceled flights, (ii) interruption to their freedom of movement and physical consequences associated with travel interruption, and (iii) lost time and money spent attempting to mitigate and remediate the effects of the CrowdStrike Outage.

### CLASS ALLEGATIONS

66.     This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

67.     Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

---

[58] CNN Staff, *Flight cancellations across the US tops 3,000*, CNN (July 19, 2024 7:51 PM), https://www.cnn.com/business/live-news/global-outage-intl-hnk/index.html.
[59] Geoff Whitmore, *The CrowdStrike Outage Is Still Impacting Airlines*, Forbes (July 22, 2024 11:24 AM), https://www.forbes.com/sites/geoffwhitmore/2024/07/22/the-crowdstrike-outage-is-still-impacting-airlines/.
[60] CNN Staff, *supra* note 58.
[61] Zoe Sottile et al., *Hundreds of US flights are canceled for the 4th straight day. Here's the latest on the global tech outage*, CNN (July 22, 2024 8:27 PM), https://www.cnn.com/2024/07/22/us/microsoft-power-outage-crowdstrike-it/index.html.

All United States citizens who had a flight delayed or canceled as a result of the CrowdStrike Outage.

68.     Plaintiffs also bring this action on behalf of themselves and all members of the following subclasses:

**California Subclass:**
All California citizens who had a flight delayed or canceled as a result of the CrowdStrike Outage.

**Ohio Subclass:**
All Ohio citizens who had a flight delayed or canceled as a result of the CrowdStrike Outage.

**Pennsylvania Subclass**
All Pennsylvania citizens who had a flight delayed or canceled as a result of the CrowdStrike Outage.

69.     Excluded from the Class are CrowdStrike, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

70.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.     The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Reports indicate as many as 46,000 flights were delayed and 5,171 flights were cancelled one the first day of the CrowdStrike Outage alone, likely affecting millions of individuals.[62]

---

[62] *See* Whitmore, *supra* note 59.

72.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.  Whether Defendant had a duty to implement and maintain reasonable procedures to prevent the publication of flawed or faulty software;

    b.  Whether Defendant failed to exercise reasonable care to prevent the publication of a flawed or faulty software update;

    c.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to prevent the publication of a flawed or faulty software update;

    d.  Whether Defendant breached duties to Plaintiffs and Class members; and

    e.  Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

73.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

74.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, experienced flight delays or cancellations as a result of the CrowdStrike Outage. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

75.     Plaintiffs will fairly and adequately represent the interests of the Class members. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiffs have no interests adverse to,

or that conflict with, the Class they seek to represent. Plaintiffs and their counsel have adequate resources to assure the interests of the Class will be adequately represented.

76.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

77.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

78.     Defendant owed a duty to Plaintiffs and all other Class members to exercise reasonable care in in maintaining, operating, and updating its software products, including a duty to detect and prevent the publication and dissemination of software or a software update containing serious flaws, errors, invalid data, or bugs. Defendant also owed a duty to Plaintiffs and all other Class members to ensure its software and software updates would not cause widespread computer network and IT system outages and interfere with Plaintiffs' and Class members' ability to travel.

79.     Defendant knew, or should have known, the risks of failing to exercise reasonable care in maintaining and operating its software products, and by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate software development, testing, and validation systems, processes, controls, policies, procedures, and protocols to prevent a software update containing serious flaws, errors, invalid data, or bugs from being published and disseminated.

80.     Defendant knew, or should have known, that publishing and disseminating a software update containing serious flaws, errors, invalid data, or bugs would cause its customers' computer networks and IT systems to experience outages. Defendant also knew or should have known that the resulting computer network and IT system outages would have widespread impact on the customers of CrowdStrike's customers, including Plaintiffs and Class members.

81.     Defendant knew that its Falcon platform is used in critical infrastructure, including the aviation sector. Defendant knew that airlines rely on their IT systems and computer networks to operate. Defendant knew, or should have known, that a large-scale IT system outage would severely impact the aviation sector, including airlines' ability to operate.

82.     Given the nature of Defendant's business, the sensitivity and value of the systems that use the Falcon platform, and the resources at their disposal, Defendant should have identified the vulnerabilities in its software development, testing, and validation systems, processes, controls, policies, procedures, and protocols, and prevented the CrowdStrike Outage from occurring.

83.     Defendant breached these duties by failing to exercise reasonable care in maintaining and operating their software products, and by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate software development, testing, and validation systems, processes, controls, policies, procedures, and protocols to prevent a

software update containing serious flaws, errors, invalid data, or bugs from being published and disseminated.

84. It was, or should have been, reasonably foreseeable to Defendant that its failure to exercise reasonable care in publishing and disseminating a software update containing serious flaws, errors, invalid data, or bugs by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate software development, testing, and validation systems, processes, controls, policies, procedures, and protocols would result in widespread computer network and IT system outages that would cause many flights to be delayed or cancelled.

85. But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, the CrowdStrike Outage would not have occurred, and Plaintiffs and Class members would not have been injured.

86. As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the CrowdStrike Outage, Plaintiffs and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) lost time incurred by delayed and canceled flights, (ii) interruption to their freedom of movement and physical consequences associated with travel interruption, and (iii) lost time and money spent attempting to mitigate and remediate the effects of the CrowdStrike Outage.

## COUNT II
### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")
#### *On behalf of the California Subclass*

87. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

88.     The UCL prohibits any "unlawful" or "unfair" business act or practice, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the CrowdStrike Outage, CrowdStrike engaged in unlawful and unfair practices within the meaning, and in violation of, the UCL.

89.     In the course of conducting its business, CrowdStrike committed "unlawful" business practices by, *inter alia*, knowingly failing to exercise reasonable care in maintaining and operating their software products, and by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate software development, testing, and validation systems, processes, controls, policies, procedures, and protocols to prevent a software update containing serious flaws, errors, invalid data, or bugs from being published and disseminated.

90.     Plaintiffs and Class members reserve the right to allege other violations of law by CrowdStrike constituting other unlawful business acts or practices. CrowdStrike's above-described wrongful actions, inaction, and want of ordinary care are ongoing and continue to this date.

91.     CrowdStrike's above-described wrongful actions, inaction, want of ordinary care, and practices also constitute "unfair" business acts and practices in violation of the UCL in that its wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. The gravity of CrowdStrike's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further CrowdStrike's legitimate business interests other than engaging in the above-described wrongful conduct.

92.     The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of CrowdStrike's violations of the UCL. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) lost time incurred by delayed and canceled flights, (ii) interruption to their freedom of movement and physical consequences associated with travel interruption, and (iii) lost time and money spent attempting to mitigate and remediate the effects of the CrowdStrike Outage.

93.     Unless restrained and enjoined, CrowdStrike will continue to engage in the above-described wrongful conduct and more outages will occur. Plaintiffs, therefore, on behalf of themselves, Class members, and the general public, also seek restitution and an injunction prohibiting CrowdStrike from continuing such wrongful conduct, and requiring CrowdStrike to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate software development, testing, and validation systems, processes, controls, policies, procedures, and protocols to prevent the publication and dissemination or additional software updates containing serious flaws, errors, invalid data, or bugs, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

### COUNT III
### PUBLIC NUISANCE
### *On behalf of the Ohio Subclass and Pennsylvania Subclass*

94.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

95.     Members of the general public, including Plaintiffs and Class members, have the right to travel freely, including the right to travel freely between states.

96.     At all relevant times, CrowdStrike owned the Falcon platform and related software responsible for the CrowdStrike Outage.

97.     As described herein, CrowdStrike's actions and lack of ordinary care, including its use of the Falcon platform and its software development, testing, and validation systems, processes, controls, policies, procedures, and protocols proximately caused the CrowdStrike Outage. The CrowdStrike Outage in turn directly caused many airlines to cancel or delay thousands of flights.

98.     Plaintiffs and Class members are persons who were traveling by plane and who had flights delayed or cancelled as a result of the CrowdStrike Outage. Due to the CrowdStrike Outage, Plaintiffs and Class members were unable to travel freely.

99.     CrowdStrike's wrongful conduct and want of ordinary care therefore created a public nuisance in the form of the CrowdStrike Outage, which substantially interfered with and inhibited the ability of members of the public (including Plaintiffs and Class members) to exercise their right to travel freely.

100.     As a result of the CrowdStrike Outage, a public nuisance, Plaintiffs and all other Class members have suffered injury and damages including, but not limited to: (i) lost time incurred by delayed and canceled flights, (ii) interruption to their freedom of movement and physical consequences associated with travel interruption, and (iii) lost time and money spent attempting to mitigate and remediate the effects of the CrowdStrike Outage.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A.     Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.     Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from causing another technology outage by adopting and implementing best software development and testing practices to protect against future outages;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.


Dated: August 5, 2024                              /s/ Cory Fein
                                                   Cory S. Fein
                                                   **CORY FEIN LAW FIRM**
                                                   712 Main Street, Suite 800
                                                   Houston, TX 77002
                                                   Tel.: 713-730-5001
                                                   Fax: 530-748-0601
                                                   cory@coryfeinlaw.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs Julio del Rio, Jack Murphy, and Steven Bixby.*

**Pro hac vice* forthcoming.